ASHWOOD MANOR CIVIC ASSOCIATION, et. al.

v.

Elizabeth H. DOLE, Secretary of Transportation of the United States of America

and

Thomas D. Larson, Secretary of Transportation of the Commonwealth of Pennsylvania.

Civ. A. No. 84–3951.

United States District Court, E.D. Pennsylvania.

March 15, 1985.

55

Edward F. Mannino, Marguerite S. Walsh, Dilworth, Paxon, Kalish & Kauffman, Philadelphia, Pa., for plaintiffs.

Alexander Ewing, Jr., Susan D. Bricklin, Asst. U.S. Attys., Philadelphia, Pa., and Edward V.A. Kussy, Asst. Chief Counsel for Right-of-Way and Environmental Law, Washington, D.C., for defendant Elizabeth H. Dole.

John Hrubovcak, Asst. Counsel, Dept. of Transp., Com. of Pa., Harrisburg, Pa., for Thomas D. Larson.

E. Barclay Cale, Jr., William H. Lewis, Jr., Coleen M. Meehan, Morgan, Lewis & Bockius, Philadelphia, Pa., for intervenor defendants.

OUTLINE

I. Introduction p. 59
II. Administrative Approval of the Highway p. 60
III. The Section 4(f) Determination p. 63
 A. The requirements of the Department of
 Transportation Act and the Standard of Re-
 view p. 63
 B. The Secretary's Delegation of Authority p. 65
 C. Other Claims of Procedural Deficiency p. 72
 D. Substantive Review p. 73
 1. The No Build Alternative p. 74
 2. The Avoidance Corridor Analysis p. 76
 3. No Feasible and Prudent Alternative p. 80
 4. Minimization of Harm p. 80
IV. The National Environmental Policy Act p. 82
V. Wetlands Finding p. 83
VI. Conclusion p. 86

MEMORANDUM OPINION
AND ORDER

VanARTSDALEN, District Judge.

I. *Introduction*

This action involves a challenge to administrative approval of construction of a highway commonly known ·as the Blue Route. The plaintiffs challenge the approval of the highway by the United States Department of Transportation, claiming failure to comply fully with several environmental laws including the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, and Executive Order 11,990, 42 Fed.Reg. 26,961 (May 25, 1977) (providing for protection of wetlands).[1] Plaintiffs have moved for partial summary judgment claiming they are entitled to judgment as a matter of law on count one, based on section 4(f) of the Department of Transportation Act, and on count two, based on NEPA. Defendants have moved for summary judgment in their favor on all of the four counts remaining in plaintiffs' complaint.[2]

The proposed Blue Route, also known as the Mid-County Expressway, I–476 and L.R. 1010, would be a 21.5 mile limited-access highway running through Delaware and Montgomery Counties a few miles west of Philadelphia. Its southern terminus would be at an interchange with Interstate Highway I–95 near the City of Chester, Pennsylvania. From the I–95 interchange it would stretch northward through Delaware County and into Montgomery County to its northern terminus, an interchange with the Pennsylvania Turnpike, I–276, at Plymouth Meeting, Pennsylvania.

The Blue Route has been in the planning stage for decades, and substantial portions of the highway have already been constructed. The portion of the highway extending from an interchange with the Schuylkill Expressway, I–76, northward to the Pennsylvania Turnpike is not involved in this litigation, that portion having been substantially completed. At issue in the present litigation is a 16.9 lineal mile portion of the highway extending from the I–95 interchange northward to the interchange with the Schuylkill Expressway.

This court enjoined the construction of the Blue Route in 1982 pending completion of a supplemental environmental impact statement (EIS) and of a more thorough analysis and determination under the mandates of section 4(f) of the Department of Transportation Act. After preparation of a supplemental EIS and section 4(f) evaluation, the highway was once again approved by the Department of Transportation, and plaintiffs once again brought an action to enjoin construction.[3] Plaintiffs' major contentions can be summarized as follows: (1) the section 4(f) determination is procedurally deficient because it was improperly delegated to a regional official; (2) the section 4(f) determination that there is no feasible and prudent alternative and that the project includes all possible planning to minimize harm to section 4(f) land is not supported by the record; (3) the supplemental EIS is deficient under NEPA because it failed to discuss adequately the alternatives to building the highway in the Blue Route corridor; (4) the supplemental EIS is deficient under NEPA in failing to discuss adequately the environmental effects of the project; and (5) there is not a sufficient finding under the requirements

---

**1.** Plaintiffs also brought a count based on Pennsylvania law, 71 P.S. § 2002, and one based on the Pennsylvania Constitution, Article I, section 27, against the Pennsylvania Secretary of Transportation. These two state law counts were dismissed on the basis of the law established by *Pennhurst State School & Hospital v. Halderman* (*Pennhurst II*), 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). *See Ashwood Manor Civic Association v. Dole,* C.A. No. 84–3951 (E.D.Pa. October 22, 1984) (Memorandum Opinion and Order).

**2.** Counts five and six of the complaint have already been dismissed, *see supra* note 1.

**3.** Some of the plaintiffs in the previous actions, *Marple Township v. Lewis,* C.A. Nos. 81–4627 and 74–925 (E.D.Pa.), have now switched sides and are advocating construction of the highway as intervenor defendants in C.A. No. 84–3951.

of Executive Order 11,990 that there is no practicable alternative to the proposed use of wetlands and that all practicable measures have been taken to minimize harm.

## II. *Administrative Approval of the Highway* [4]

Planning for an expressway through Delaware and Montgomery Counties began at least as early as the 1950's. In the late 1950's and early 1960's studies were conducted of various possible locations for the highway. Among the locations studied was one corridor designated the Blue Route, which is essentially the route currently proposed for construction. Also studied were routes designated the Red/Yellow Route to the east of the Blue Route, and the Green Route to the west of the Blue Route.

In 1961 the Pennsylvania Highway Department proposed to build the Blue Route, and public hearings were held to consider the issue. That route was approved, and final design began in 1964. Construction began in 1967.

In the late 1960's certain laws passed by Congress revolutionized the process of approval of highways funded by the federal government. Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303,[5] enacted in 1966, provides in part as amended:

> The Secretary may approve a transportation program or project requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if—
>
> (1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4347, became effective on January 1, 1970. NEPA requires that, before a project such as a federally funded highway can be approved, an environmental impact statement (EIS) must be prepared and made available to the public to ensure that all the environmental consequences of such a project are carefully considered.

Although much of the planning for the Blue Route was completed prior to passage of these acts, both NEPA and section 4(f) are fully applicable to the 16.9 mile portion of the Blue Route at issue in this case. Whether or not otherwise required, the Pennsylvania Department of Transportation (PennDOT) and the Federal Highway Administration (FHWA) in the 1970's consented to the applicability of NEPA and section 4(f) to certain planned projects, which included the Blue Route.

In 1974 preparation of an EIS/Section 4(f) Statement for the 16.9 mile section of the Blue Route at issue was begun. That statement was circulated to the public in draft form in 1976 and was submitted to the Federal Highway Administration as a final EIS in 1978. The Federal Highway Administrator and the Secretary of Transportation tentatively refused to approve the project pending consideration of, inter alia, "downscoping" the project, including possible reduction in the number of lanes, the design speed, the median strip width, and the size of the interchanges.

In 1979 a "Task Force" was formed, composed of officials from the FHWA and PennDOT. The Task Force issued a report in 1980 recommending several measures: (1) reducing the median width; (2) replac-

---

**4.** A more detailed discussion of the history of the project can be found in the court's previous opinion and order in *Marple Township v. Lewis,* C.A. Nos. 81–4627 and 74–925 (E.D.Pa. Aug. 30, 1982). *See also* Final Supplemental EIS/Section 4(f) Evaluation II–7 to II–9.

**5.** An essentially identical provision was contained in the Federal-Aid Highway Act Amendment of 1968, 23 U.S.C. § 138.

ing some of the cloverleaf interchanges with smaller, diamond-shaped interchanges; (3) eliminating one interchange (a proposed partial interchange with PA–320, Sproul Road); (4) providing "park and ride" facilities near certain interchanges; and (5) reducing the number of lanes from six to four between I–95 and West Chester Pike.

The Task Force recommendations were adopted. What had previously been designated the "Final EIS" was renamed the "base Final EIS" and the Task Force report was incorporated as an "Addendum." On the basis that the base Final EIS together with the Addendum satisfied NEPA, the Task Force's scaled-down version of the Blue Route was administratively approved. Several local governments and citizen groups brought an action to enjoin construction of the highway. On August 30, 1982 I enjoined construction of the highway pending completion of a supplemental EIS considering the effects of the Task Force scaling down the project and further articulation of why there was no feasible and prudent alternative to using land protected by section 4(f).

In response to the court order in *Marple Township v. Lewis*, C.A. Nos. 81–4627 and 74–925 (E.D.Pa. Aug. 30, 1982), the FHWA and PennDOT prepared a draft and supplemental Environmental Impact Statement/Section 4(f) Evaluation. In July 1983, the draft supplemental EIS/4(f) Evaluation was circulated for review and comment, and public hearings were held on September 14 and 15, 1983.

A final supplemental EIS/4(f) Evaluation was prepared by the Region III headquarters of the FHWA and forwarded to the Washington office for approval. On March 1, 1984 the FHWA informed the office of the Assistant Secretary of Transportation for Policy and International Affairs and the office of the General Counsel to the Secretary that it was reviewing the proposed final supplemental EIS/4(f) Evaluation for approval. (*See* Administrative

Record (A.R.) 213; Affidavit of Jeffery N. Shane [Exhibit A to Docket Entry # 44] ¶ 12.) Two weeks later, no action having been taken by either the Assistant Secretary's office or the General Counsel's office, both of those offices by their silence expressed their approval of the highway. Either office could have intervened within that two week period, or apparently at any time prior to the concurrence by the FHWA Washington office. (*See* Shane Affidavit; A.R. 305 at 148).

The Washington office of the FHWA granted its "prior concurrence" in the final supplemental EIS/4(f) Evaluation on April 9, 1984. (A.R. 252). The FHWA prior concurrence was signed by Harter Rupert, Chief, Environmental Review Branch of the FHWA. On the same day, the final supplemental EIS/4(f) Evaluation was signed by Vincent Ciletti, Director, Office of Planning and Program Development, FHWA Region III.[6] After publication in the Federal Register of notice of the availability of the EIS, Vincent Ciletti signed the record of decision formally approving the project on July 25, 1984. (A.R. 303).

As reflected in the final supplemental EIS/4(f) Evaluation and the record of decision (ROD), Ciletti, on behalf of the Secretary, approved the Selected Alternative, which was the Task Force Alternative with certain minor alterations, and found that there was no feasible and prudent alternative to the use of section 4(f) land and that the proposal included all possible planning to minimize harm to section 4(f) land. In his approval of the project, Ciletti noted that the use of parklands and historic sites had been significantly reduced from the plan as proposed in the pre-Task Force EIS/4(f) Statement. He acknowledged that "[f]rom a naturalistic point of view, the Do Nothing Alternative could be considered the preferred environmental alternative in the corridor since no physical disruption would occur in the stream valleys." (A.R. 303 at 3). He concluded, however,

---

**6.** The final document as signed by Ciletti is item 253 in the Administrative Record before the court. It is bound in two volumes.

considering "the transportation needs within the corridor and the environmental impacts" that "the Selected Alternative is considered to be in the public interest and is overall environmentally preferred." (*Id.*)

With regard to the section 4(f) determination, the major alternatives discussed were the Total Avoidance Alternative, the Do Nothing Alternative, and the Improvements to Local Roads Alternative. The Do Nothing Alternative is essentially identical to the Improvements to Local Roads Alternative considering the forecast that doing nothing would result in such congestion of traffic that local residents would demand improvement in local roads. (Final Section 4(f) Evaluation at III–17). These two alternatives are collectively referred to as the No Build Alternative.

My opinion in *Marple Township v. Lewis* directed that, in making the section 4(f) determination, the Secretary should consider possible routes outside the Blue Route corridor. (Slip op. at 38). The final section 4(f) evaluation describes an "Avoidance Corridor Analysis" that was conducted to determine whether a feasible and prudent alternative route could be found outside the Blue Route corridor. (Final Section 4(f) Evaluation, part II).

The first step of this avoidance corridor analysis was to define the area within which to develop alternative corridors. The issue was referred to the Delaware Valley Regional Planning Commission (DVRPC).[7] The DVRPC prepared a report in December 1982 entitled Supplemental Data for the Mid-County Expressway. (Exhibit A to Affidavit of Marguerite S. Walsh [Docket Entry #48], hereafter cited as DVRPC Report). The DVRPC blocked out three travel bands (A, B & C) in which the highway might theoretically be located. The travel bands are each approximately 75 square miles in size, lie to the west of the Schuylkill Expressway and stretch between I–95 and the Pennsylvania Turnpike. Trav-

el Band C is the band farthest east (nearest to Philadelphia), and is where most of the Selected Alternative is located. Travel Band B is to the west of Travel Band C, and Travel Band A is to the west of Travel Band B.

The DVRPC study projected the daily miles of travel for a highway located in each of the respective travel bands. The figures for daily miles of travel projected in the DVRPC study were as follows: Travel Band A, 1,498,021 daily miles of travel; Travel Band B, 2,844,136 daily miles of travel; and Travel Band C, 3,573,-336 daily miles of travel. The DVRPC also used its data in a mathematical formula to determine the location for the highway that was "most suitable to serve the travel needs of the metropolitan area." (DVRPC Report at 9). The study concluded that the optimal location for the highway was 7.7 miles west of the Schuylkill Expressway and noted that such a location "coincides with the median of the proposed Mid-County Expressway in [Travel Band] C." (*Id.* at 11).

Noting, on the basis of the DVRPC study, that "an alignment located in Travel Band A would serve 60% less traffic than one located in Travel Band C; and 40% less than in Travel B," PennDOT and FHWA "determined that travel demand in that Travel Band would not warrant a facility and therefore no alignments [in Travel Band A] were studied or evaluated." (Final Section 4(f) Evaluation at II–2). Thus, the avoidance corridor analysis—seeking a location for the highway that totally avoided all section 4(f) lands—was limited to the 150 square mile study area of travel bands B and C.

The avoidance corridor analysis developed 46 corridors that could serve the basic transportation needs of the area and avoid all section 4(f) lands. On the basis of a comparison of six categories [8] of adverse

---

7. The DVRPC is an advisory body that is the agency designated to perform traffic assignments and evaluations for federal-aid projects in this region. (See A.R. 35 at I–1; Notes of Testi-

mony of Vincent Ciletti, Sept. 19, 1984, Docket Entry #33, at 30–31).

8. The six categories of impacts studied in this initial screening were: stream relocations; resi-

impacts of each of the potential corridors, eleven "Candidate Corridors" were selected for further analysis.

These eleven Candidate Corridors were compared with respect to thirteen categories of adverse impacts.[9] This comparison yielded a single corridor (C–1) that was deemed "clearly least disruptive." (Final Section 4(f) Evaluation at II–8). This corridor was designated the Total Avoidance Corridor and was subject to further analysis in comparison to the Selected Alternative.

During the public comment stage, the Total Avoidance Alternative received vehement opposition similar to the opposition expressed as to the Selected Alternative. Interestingly, no one involved in this litigation (including plaintiffs, state and federal defendants and intervenor defendants) argues that the Total Avoidance Alternative is feasible and prudent. In the section 4(f) determination Ciletti found that "[t]he Total Avoidance Alternative would have unusual impacts on the communities through which it passes and cumulative impacts of extraordinary magnitude." (A.R. 303 at 7). On the basis of the impacts discussed in the Final Section 4(f) Evaluation, Ciletti concluded that the Total Avoidance Alternative was not feasible and prudent.

Ciletti also found that the Do Nothing Alternative and the Improvements to Local Roads Alternative were not feasible and prudent. Essentially, he found that, if the highway were not built, local roads would become severely congested, requiring the widening of existing roads. Widening such roads, in turn, would not adequately meet the transportation needs of the region and would require using a number of section 4(f) sites.

Ciletti also considered four localized shifts from the Task Force Alternative to avoid specific section 4(f) sites. Of these shifts, only Shift 2 was adopted. By including Shift 2 in the Selected Alternative, PennDOT and FHWA avoided use of the Springfield Country Club and reduced the amount of land taken from Smedley Park by 0.2 acres. Shifts 1, 3 and 4 were found not to be feasible and prudent.

Finally, having found that there was no feasible and prudent alternative to the use of section 4(f) lands in the Selected Alternative, Ciletti also found that the highway proposal included all possible planning to minimize harm. Ciletti was satisfied with the proposed noise abatement measures, landscaping plans and functional replacement of land taken. He found that such measures fulfilled the requirements of section 4(f)(2).

### III. *The Section 4(f) Determination*

### A. *The Requirements of the Department of Transportation Act and the Standard of Review*

Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303, provides that the Secretary of Transportation may approve a highway project that uses public parkland or historically significant land only if—"(1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use." The Act explicitly declares that "[i]t is the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a).

---

dential relocations; number of historic sites subject to potential impacts (but not 4(f) acquisitions); consistency with local land use plans; disruption to local communities; and cost. (Final Section 4(f) Evaluation at II–5).

**9.** The thirteen categories used in the second screening were: consistency with land use; disruption to local communities; direct effects on business nodes; number of residences; number of apartment buildings; number of commercial/industrial buildings; stream crossings required; feet of stream relocation; acres of prime farmland; historic sites within 50 feet, total acres; length of the link; and total cost. (Final Section 4(f) Evaluation at II–9).

In searching for the appropriate route for a new highway, particularly in an urban or heavily developed suburban area, the costs and adverse impacts of placing a highway through developed land are readily apparent and often easily quantifiable. In such circumstances it may seem expedient to plan highways over what little open land remains in the area because the costs associated with taking such land are not easily quantifiable. Moreover, although taking developed land will almost certainly meet with resistance from the landowners, using land already publicly owned may meet with less avid resistance.

As the Supreme Court stated in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971), section 4(f) is "a plain and explicit bar to the use of federal funds for construction of highways through parks—only the most unusual situations are exempted." The Secretary may not find that the interest in preserving parkland is overridden in a particular instance merely by balancing factors such as cost and community disruption caused by a route through parkland against the cost and community disruption associated with a route through developed land.

> Congress clearly did not intend that cost and disruption of the community were to be ignored by the Secretary. But the very existence of the statutes indicates that protection of parkland was to be given paramount importance. The few green havens that are public parks were not to be lost unless there were truly unusual factors present in a particular case or the cost or community disruption resulting from alternative routes reached extraordinary magnitudes. If the statutes are to have any meaning, the Secretary cannot approve the destruction of parkland unless he finds that alternative routes present unique problems.

*Overton Park*, 401 U.S. at 412–13, 91 S.Ct. at 821–22 (footnotes omitted).

In the present case, the Secretary, through her delegate, did find that there was no feasible and prudent alternative to using section 4(f) land and that all possible planning to minimize harm was included in the proposal. The Secretary's determination under section 4(f) is subject to review in federal district court pursuant to section 701 of the Administrative Procedure Act, 5 U.S.C. § 701. *See Overton Park*, 401 U.S. at 410–13, 91 S.Ct. at 820–22. The standard of review under the Administrative Procedure Act applicable to section 4(f) determinations is set forth in *Overton Park*, 401 U.S. at 415–17, 91 S.Ct. at 823–24.

■ The Secretary's decision is entitled to a presumption of regularity, but that presumption does not shield her decision from a "thorough, probing, in-depth review." *Id.* at 415, 91 S.Ct. at 823. There are three aspects to the inquiry required of a court reviewing a section 4(f) determination. *See id.* at 415–17, 91 S.Ct. at 823–24; *Arizona Past & Future Foundation v. Lewis*, 722 F.2d 1423, 1425 (9th Cir.1983); *Environmental Defense Fund v. Volpe*, C.A. Nos. 70–2651 and 72–419, slip op. at 20–21 (E.D.Pa.1982), *see also Township of Springfield v. Lewis*, 702 F.2d 426, 441 (3d Cir.1983). The first inquiry is whether the Secretary acted within the scope of her authority. This first inquiry has two parts. First, the court must determine whether the Secretary properly construed her authority under section 4(f), and second, the "court must be able to find that the Secretary could have reasonably believed that in this case there [were] no feasible and prudent alternatives or that alternatives [did] involve unique problems." *Overton Park*, 401 U.S. at 415–16, 91 S.Ct. at 823. The second inquiry is whether the actual choice made was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823.

> To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and

careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency. *Id.* The Third, and final, inquiry is whether the Secretary followed all the necessary procedural requirements. *Id.* at 417, 91 S.Ct. at 824.

## B. *The Secretary's Delegation of Authority*

Despite the size and importance of this highway project and the longstanding controversy surrounding it, the section 4(f) determination was not made personally by the Secretary of Transportation, as some section 4(f) determinations have been made in the past. *See, e.g., Overton Park,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Instead, the decision was delegated to Vincent Ciletti, the FHWA Region III Director of the Office of Planning and Program Development. Plaintiffs argue that this delegation is impermissible under the mandate of section 4(f). They argue that section 4(f) requires the Secretary herself to make the findings. Plaintiffs further argue that, even if the Act is construed to allow delegation, the section 4(f) determination is invalid because of lack of supervision and direction by the officials who delegated authority.

Plaintiffs' argument that the section 4(f) determination is nondelegable has some appeal but does not appear to be supported by the law. As a practical matter, an official such as the Secretary of Transportation must of necessity delegate many discretionary functions. Nevertheless, by enacting section 4(f), Congress contemplated that use of parklands be few and far between. I can think of no more effective way of limiting the use of parklands to truly unique situations than to require the Secretary of Transportation personally to make all section 4(f) determinations while subjecting each determination to a thorough, probing, in-depth review by a federal district court. I cannot conclude, however, that Congress intended the Secretary personally to make each section 4(f) determination. In practical terms, allowing del-

egation permits, and may effectively cause, a more thorough examination by the decisionmaker.

Plaintiffs' argument is based on the language of section 4(f) which declares, *"The Secretary* may approve a ... project requiring the use of [parkland] ... only if— (1) there is no prudent and feasible alternative ...; and (2) the program or project includes all possible planning to minimize harm...."* 49 U.S.C. § 303(c) (emphasis added). The statute speaks of what "the Secretary" may do, not of what the Department of Transportation may do, nor of what the Secretary or her delegate may do.

Plaintiffs attempt to support their argument by citing various cases in which the Secretary was personally involved in the decisionmaking and in which there is language suggesting that only the Secretary may make the findings required by section 4(f). Personal involvement of the Secretary in one case, however, does not mandate personal involvement in another. Moreover, all of the case language plaintiff claims suggests that the Secretary must personally make the decision actually refers to the responsibility of the Secretary vis a vis parties outside the Department of Transportation. *See D.C. Federation of Civic Associations v. Volpe,* 459 F.2d 1231, 1249 (D.C.Cir.1972) ("the Secretary himself must decide," meaning Secretary must reach decision on the merits, not on the basis of political pressure), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1975); *Environmental Defense Fund v. Brinegar,* 4 E.L.R. 20,534, 20,542 (E.D.Pa. 1974) ("The responsibility for making the determination mandated by § 4(f) lies, of course, with the Secretary of U.S. DOT and not with this Court."); *Lathan v. Volpe,* 350 F.Supp. 262, 267 (W.D.Wash.1972) ("the Secretary alone must make the determination," referring to the relative authorities of the U.S. Secretary and state and local officials), *aff'd in pertinent part,* 506 F.2d 677 (9th Cir.1974); *see also Brooks v. Volpe,* 350 F.Supp. 269, 282 (W.D.Wash. 1972) ("There can be no doubt that in the instant case the Secretary was required to

make the necessary certification,"—the Ninth Circuit had previously held that § 4(f) lands were "used" within the meaning of the statute, and so a § 4(f) determination was required), *aff'd,* 487 F.2d 1344 (9th Cir.1973).

■■■■ To determine whether an agency head may delegate authority established by an act of Congress, the court should look to the legislative intent of the statute. *See Fleming v. Mohawk Wrecking & Lumber Co.,* 331 U.S. 111, 119–23, 67 S.Ct. 1129, 1133–35, 91 L.Ed. 1375 (1947). Express statutory authority is not necessarily required for delegation within an agency. *Hall v. Marshall,* 476 F.Supp. 262, 272 (E.D.Pa.1979), *aff'd,* 622 F.2d 578 (3d Cir. 1980); *see also Tabor v. Joint Board for Enrollment of Actuaries,* 566 F.2d 705, 708 & n. 5 (D.C.Cir.1977); *Wirtz v. Atlantic States Construction Co.,* 357 F.2d 442 (5th Cir.1966). If Congress clearly expresses an intent that no delegation is to be permitted, then that intent must be carried out. *See United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). *See generally* 1 K. Davis, Administrative Law Treatise § 3:18 (2d ed. 1978).

In the Department of Transportation Act, the intent to permit delegation is clear. The Act explicitly provides for delegations of authority:

> The Secretary may delegate, and authorize successive delegations of, duties and powers of the Secretary to an officer or employee of the Department. An officer of the Department may delegate, and authorize successive delegations of, duties and powers of the officer to another officer or employee of the Department. However, the duties and powers specified in sections 103(c)(1), 104(c)(1), and 106(g)(1) of this title may not be delegated to an officer or employee outside the Administration concerned.

49 U.S.C. § 322(b). Plaintiffs have cited no provision of the Act or excerpt from its legislative history that would suggest that the authority to make a section 4(f) determination cannot be delegated.

On the other hand, defendants have cited a number of cases in which section 4(f) determinations made by delegates of the Secretary have been approved by federal courts. *Louisiana Environmental Society Inc. v. Dole,* 707 F.2d 116, 118 (5th Cir.1983) (Federal Highway Administrator); *Township of Springfield v. Lewis,* 702 F.2d 426, 433 (3d Cir.1983) (FHWA Regional Director); *Monroe County Conservation Council v. Adams,* 566 F.2d 419, 426 (2d Cir.1977) (Federal Highway Administrator), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1977); *Maryland Wildlife Federation v. Lewis,* 560 F.Supp. 466, 469–71 (D.Md.1983) (Federal Highway Administrator), *aff'd,* 747 F.2d 229 (4th Cir. 1984); *Citizens Committee for Environmental Protection v. United States Coast Guard,* 456 F.Supp. 101, 106 (D.N.J.1978) (Commandant of the Coast Guard); *Inman Park Restoration v. Urban Mass Transportation Administration,* 414 F.Supp. 99, 125–26, 129 (N.D.Ga.1975), *aff'd,* 576 F.2d 573 (5th Cir.1978) (Urban Mass Transportation Administrator). The issue of the validity of the delegation of approval authority was not raised by the parties in any of these cases. Only one of the cited cases, however, *Township of Springfield v. Lewis,* 702 F.2d 426 (3d Cir.1983), presented a decisionmaker as remote from the Secretary as that in the present case.[10]

In consideration of the novelty of the issue and the intense controversy surrounding this project, I have conducted a thorough review of the delegation of authority to approve this project. The two major issues I have focused on in conducting this review are whether the delegation was val-

**10.** It is not clear from the reported decision precisely who was the decisionmaker in *Township of Springfield v. Lewis,* although it appears that it was John J. Kessler, Jr., *see* 702 F.2d at 433, who was the Division Administrator of the New Jersey Division of the FHWA, *see* 702 F.2d at 428. Federal defendants' brief in the present case, however, represents that the decision in *Township of Springfield v. Lewis* was made by an FHWA Regional Director. Either of these officials is approximately as remote in authority from the Secretary as Vincent Ciletti, who was an FHWA Regional Director.

id under the procedures within the Department of Transportation and whether the delegation was consistent with the purposes and the mandate of section 4(f).

Although the Act explicitly permits delegation and subdelegation, 49 U.S.C. § 322, there may be some limit to the degree of delegation that is consistent with the mandate of section 4(f). If no delegation were permitted it would clearly "mean less, not greater, attention to the intrinsic merits of each situation requiring action." *Wirtz*, 357 F.2d at 445. If, however, there were no limitations whatsoever upon the delegation permitted in a given situation, those charged with responsibility by Congress could wholly abdicate that responsibility and frustrate the intent of Congress and the policy of the Act in question. *Cf. National Small Shipments Traffic Conference, Inc. v. Interstate Commerce Commission*, 725 F.2d 1442, 1450–51 (D.C.Cir. 1984) ("At some point ... staff-prepared synopses may so distort the record that an agency decisionmaking body can no longer rely on them in meeting its obligations under the law.").

Excessive delegation may also frustrate the policy of the Act by encouraging the decisionmaker to misconstrue his or her authority under the Act as delegated. Before protected lands can be used, the Act requires the decisionmaker to find that there is no feasible and prudent alternative and that harm is minimized. In a highly controversial project such as this one, in which extensive litigation is expected, (*see* A.R. 280), a person well down the line of delegation from the Secretary may perceive that the decision to approve the project is being made on several levels of authority above, and that his or her role is merely to provide adequate documentation to support a finding of no feasible and prudent alternative. The official to whom authority is delegated is placed in the difficult position of having to exercise independent judgment while following the instructions of those

responsible for oversight and supervision. The officials delegating authority, on the other hand, must not abdicate their responsibility for oversight and supervision but must not unduly influence the decisionmaker in such a way that the ultimate decision is not based on independent judgment in consideration of only the relevant factors.

Section 4(f) dictates the exercise of prudence, which requires independent judgment, to determine which unique situations involve such extraordinary impacts as to warrant the use of protected land. If the authority to make the section 4(f) determination is delegated too far down the line and subject to undue influence from above, independent judgment is precluded and the delegation would be inconsistent with section 4(f). Prudence, on the other hand, also requires an expertise in environmental issues and a thorough familiarity with the specific impacts of all possible alternatives. Thus, if the Secretary herself made the determination without fully reviewing all the available information, the failure to delegate responsibility to one familiar with the record would be equally inconsistent with the Act.

 With these concerns in mind, a detailed examination of the delegation and oversight exercised with respect to approval of the Blue Route follows. Tracing the precise avenue of delegation in this case is no easy task; although the path can be followed, the road is not always clearly marked, and it takes a few unexpected turns.[11]

As noted above, the Act itself authorizes the Secretary to delegate and authorize successive delegations of duties and powers of the Secretary, and authorizes officers of the Department of Transportation to subdelegate. 49 U.S.C. § 322. The Secretary has explicitly delegated authority to make section 4(f) determinations to the Federal Highway Administrator. 49 C.F.R. § 1.45(a)(4); *see also* 49 C.F.R. § 1.48(b)(21) (delegating Secretary's authority to carry

---

11. A.R. 305 documents the delegation and the procedure for a section 4(f) determination. (Bulk Documents File, Box 1). The general procedure and that followed in this case are outlined in the affidavit of Jeffrey N. Shane. (Exhibit A to Docket Entry # 44).

out duties under 23 U.S.C. § 138, a provision essentially identical to § 4(f)); U.S. DOT Order 1100.60 at I–41, A.R. 305 at 29. The Federal Highway Administrator has authority to redelegate section 4(f) decisionmaking power, 49 C.F.R. § 145(b); 23 C.F.R. § 1.37; *see also* 49 U.S.C. § 322, and has done so by delegating the power to the various FHWA Regional Administrators. (FHWA Order 1–1, A.R. 305 at 285). The Region III Administrator delegated responsibility to make the approval required by section 4(f) to the Region III Director of Planning and Program Development, Vincent Ciletti. (A.R. 305 at 290).

Both the delegation to the Regional Administrator and his delegation to Ciletti were subject to a significant limitation. The prior concurrence of the Washington Headquarters of the FHWA was required for certain "highly controversial" projects. A project is considered highly controversial, and therefore requires prior concurrence "when the action is opposed on environmental grounds by a Federal, state, or local agency or by a substantial number of the persons affected by such action." U.S. DOT Order 5610.1C ¶ 11(d), A.R. 305 at 148.

In addition to prior concurrence of the FHWA Washington Headquarters, the prior concurrence procedure also provided for notice to the Assistant Secretary for Policy and International Affairs and to the General Counsel to the Secretary that the final documents were under review for approval. The Assistant Secretary and the General Counsel were to be provided with copies of the summary section of the final documents and were to be given at least two

weeks notice before approval by the Washington Headquarters of the FHWA. U.S. DOT Order 5610.1C ¶ 11(d), A.R. 305 at 148.[12] This procedure was followed (*see* A.R. 213). The Assistant Secretary's Office conducted an independent review of the entire final supplemental EIS/4(f) Evaluation, was briefed on the project by the FHWA, and decided that no further involvement by the Office of the Secretary was required.[13] (Shane Affidavit ¶¶ 12–15; A.R. 222). Prior concurrence by the FHWA Washington Office was not granted until April 9, 1984, well after two weeks had passed since notice to. the Assistant Secretary and General Counsel. The failure of the Assistant Secretary and the General Counsel to intervene prior to the prior concurrence of the FHWA Washington Office constituted their implicit approval of the project.

The FHWA Organization Manual vests authority in the Associate Administrator for Right-of-Way and Environment to "give prior concurrence of the Washington Headquarters for final environmental impact statements and section 4(f) approvals." (FHWA Order 1–1 ¶ 11(i), A.R. 305 at 285). It also provides that this authority may be redelegated. On April 6, 1984 the Associate Administrator for Right-of-Way and Environment delegated prior concurrence authority to Ali F. Sevin, the Director of FHWA's Office of Environmental Policy. This authorization also permitted redelegation. (A.R. 305 at 287). Mr. Sevin, in turn, delegated the authority to grant prior concurrence of the Washington Headquarters to Harter M. Rupert, Chief of the Environmental Review Branch. It was Mr. Ru-

---

**12.** Prior to July 13, 1982 the prior concurrence of the Assistant Secretary for Policy and International Affairs and of the General Counsel were required for highly controversial projects. *See* 47 Fed.Reg. 43,243 (Sept. 30, 1982). U.S. DOT Order 5610.1C (Procedures for Considering Environmental Impacts) was revised as of July 13, 1982 to provide for the new procedure outlined in the text above, which, for want of a better term, could be designated concurrence by silence. Notice of the change was published in the Federal Register. 47 Fed.Reg. 43,243 (Sept. 30, 1982).

**13.** The term "Office of the Secretary" refers to the Secretary, Deputy Secretary, five Assistant Secretaries, General Counsel, Inspector General and all of the various officials and offices that report to each of them. The FHWA is a separate entity within the Department. *See* A.R. 305 at 2; Shane Affidavit ¶ 5 n. 2; 49 C.F.R. §§ 1.21–.26. Within the Office of the Secretary, the Assistant Secretary for Policy and International Affairs is responsible for environmental impact coordination and review. 49 C.F.R. § 1.23(b).

pert, who, on April 9, 1984, signed the prior concurrence authorizing approval of the Blue Route. (A.R. 252). On that same day, Vincent Ciletti signed and dated the final supplemental EIS/4(f) Evaluation. (A.R. 253).

In summary, authority to make the section 4(f) determination was delegated to Vincent Ciletti. Ciletti made the determination after receiving the prior concurrence of the Washington Headquarters of FHWA. Authority to grant the prior concurrence of the Washington Headquarters of FHWA was delegated to Harter M. Rupert. Rupert granted prior concurrence after two weeks had passed following the notification to the Assistant Secretary for Policy and International Affairs and to the General Counsel that the matter was under review.

The procedures followed in approving this action all appear to be valid under the statute, which permits delegation and redelegation, and the relevant regulations and administrative orders. Plaintiffs argue that a provision in the FHWA Organization Manual stating that section 4(f) authority is reserved to the Secretary makes the delegations invalid. (FHWA Order 1–1, A.R. 305 at 192). This provision, dating from December 14, 1970, is patently inconsistent with subsequently added provisions in the same document. (*See* FHWA Order 1–1, A.R. 305 at 285 (March 30, 1984)). More important, the Secretary, since that provision was adopted, has clearly delegated authority to act under section 4(f) to the Federal Highway Administrator, U.S. DOT Order 1100.60 at I–41, A.R. 305 at 29, 49 C.F.R. § 1.45(a)(4), and has not reserved that authority, U.S. DOT Order 1100.60 at I–32 through I–40, A.R. 305 at 22–28; 49 C.F.R. § 1.44. The subsequent orders of the Federal Highway Administra-

tor and the superior orders of the Secretary of Transportation clearly supersede this inconsistent provision.[14]

■ Plaintiffs argue that, even if the delegation was valid, the approval is invalid because the delegating officials failed to exercise adequate supervision over those to whom authority was delegated. The FHWA Organization Manual provides:

Authority redelegated by appropriate officials is subject to their policy direction and coordination and to such restrictions as the redelegating officials deem appropriate. A redelegation of authority does not relieve the redelegating official of overall responsibility for control over policy, review of operations, standardization of procedures and methods, and in the final analysis, performance stemming from exercise of the delegated authority.

(FHWA Order 1–1, A.R. 305 at 174). Certainly the Secretary cannot dispute that she retains ultimate responsibility for the section 4(f) determination. On the present record I conclude that there was adequate supervision with respect to the section 4(f) determination.

The prior concurrence procedure and the requirement of notice to the Assistant Secretary for Policy and to the General Counsel provide for adequate supervision. The procedure requiring prior concurrence of the Washington Headquarters for highly controversial projects enables the FHWA to exercise oversight of the regional officials who make section 4(f) determinations and approve EIS's. The delegation of the prior concurrence authority within the FHWA Washington Headquarters to Rupert, who had expertise in environmental policy and was familiar with the project at

14. To the extent that 23 C.F.R. § 771.125(e) is inconsistent with U.S. DOT Order 5610.1C as amended in 1982, the amended order supersedes the authority of that section. Part 771 of title 23 of the Code of Federal Regulations is expressly adopted under the authority of U.S. DOT Order 5610.1C dated September 18, 1979, as it existed prior to the 1982 amendment. 23 C.F.R. § 771.103(a)(8). Because the order was

amended in 1982 and the regulation was adopted under the authority of the order prior to the amendment, any inconsistency must be resolved in favor of the most recent version of the order. Although notice of the change in the order was published in the Federal Register, 47 Fed.Reg. 43,243 (Sept. 30, 1982), 23 C.F.R. § 771.125(e) appears not to have been updated.

issue, was a reasonable and prudent action consistent with the policy of section 4(f). Rupert, in turn, relied to a great degree on the report and recommendations of William Van Luchene, but Rupert himself made the concurrence based on his own personal review of the project and employing his own independent judgment. (*See* A.R. 252).

Within the Office of the Secretary, the Assistant Secretary for Policy and International Affairs is charged with the primary responsibility for environmental impact coordination and review. The environmental documents and comments from the public were thoroughly reviewed in the Assistant Secretary's Office under the supervision of Jeffrey N. Shane, the Deputy Assistant Secretary for Policy and International Affairs. Shane is the person responsible for oversight of implementation of section 4(f) and culls through projects to determine which should be brought to the attention of the Secretary herself.

In the process that led to a reduction in the scope of the project by adoption of the Task Force Alternative back in 1980, the Office of the Secretary demonstrated that it was not simply rubber-stamping any proposal for this project that came before it. Confronted with a final EIS/4(f) Statement, the Secretary refused to approve the project pending consideration of a scaled-down version. (*See* A.R. 18). A Task Force was appointed to study the possibility of scaling-down the size of the highway, and its recommendation, which is less intrusive to the environment and to section 4(f) lands, was adopted.

The draft supplemental EIS/4(f) Evaluation prepared in response to the court order in *Marple Township v. Lewis* was reviewed within the Office of the Secretary by Joseph Canny, the Deputy Director for Environmental and Policy Review in the Environmental Division, Office of Economics. On September 26, 1983, Mr. Canny sent his suggestions with respect to the section 4(f) determination to the FHWA. (A.R. 159; A.R. 163). Among his suggestions he indicated that two of the minor shifts to avoid section 4(f) land, shifts 1 and 2, seemed as if they might well be feasible and prudent or, at least, should be studied further. (A.R. 159). The Washington Office of the FHWA made similar comments on the draft supplemental EIS/4(f) Evaluation. (A.R. 162).[15] The feasibility and prudence of shifts 1 and 2 were studied further, and the Selected Alternative includes Shift 2.

Secretary Dole herself received a memorandum from the Assistant Secretary for Policy and International Affairs, Matthew V. Scocozza, on October 7, 1983, listing ten environmentally controversial highway projects for which intervention by the Office of the Secretary should be considered. The summary of the Blue Route received by Dole read:

*I-476, Mid County Expressway, "Blue Route", Pennsylvania.* This proposed interstate through western Philadelphia suburbs would connect I–76 and I–95. The project is controversial, due to impacts on Swarthmore College, parklands, historic sites and affected communities. Interior [Department] is strongly opposed.

*Status:* The EIS was approved in 1980. Sections of the highway have been built. The project is currently enjoined, pending completion of a supplemental EIS and a new section 4(f) evaluation. A draft of these documents has been circulated. We may wish to request [Office of the Secretary of Transportation] review of final documents to assure that adequate attention is paid to conditions of the pre-

---

**15.** The General Counsel's Office reviewed the draft supplemental EIS/4(f) Evaluation but its comments cannot be discerned from the Administrative Record because, for the most part, it simply "concur[red] in the attached comments of Regional Counsel Locke." (A.R. 164). The comments of Regional Counsel Locke are not attached to A.R. 164 and do not appear to be part of the Administrative Record. The record does reflect, however, that the Chief Counsel's Office was complying with its limited duty to oversee the implementation of section 4(f). The primary responsibility for oversight of implementation of section 4(f) in the Office of the Secretary rests with the Assistant Secretary for Policy and International Affairs. *See* 49 C.F.R. § 1.23(b).

vious approval, including measures to reduce impacts to Swarthmore College, provision of park and ride lots in the corridor and hiring of an environmental monitor. (Federal Defendants' Answers to Plaintiffs' First Request for Production of Documents, Request # 4). Jeffrey Shane "discussed the memorandum with the Secretary, who did not specifically comment on the Blue Route nor express an intent to become personally involved with the project." (Shane Affidavit ¶ 10).

▆ Approximately one month later, a meeting was held with the Secretary, Raymond Barnhart (the Federal Highway Administrator), Matthew Scocozza and Jeffrey Shane present to discuss further the controversial highway projects. In a memo prepared for that meeting the Blue Route was summarized as follows:

> *I-476, "The Blue Route," Philadelphia area* Local views on the project are split and led to litigation which overturned a compromise solution approved in 1980. Rep. Bob Edgar helped engineer the compromise. The Senators have not been involved.
>
> A clear indication that we continue to support the main features of the compromise is all that is needed now.

(Federal Defendants' Answers to Plaintiffs' First Request for Production of Documents, Request # 4).[16] It appears that the Secretary did not believe it was necessary for her to be personally involved in the approval of the Blue Route, as this meeting is the last reference on the record of any involvement of the Secretary whatsoever.[17]

The Office of the Secretary, however, continued to be involved in the approval of the project. On March 1, 1984 the summary section of the proposed final supplemental EIS/4(f) Evaluation was forwarded to the Assistant Secretary's Office. Due to the nature and significance of the project, that office obtained a complete version of the document and conducted a thorough review. (Shane Affidavit ¶ 12). Those personally reviewing the document determined that personal intervention by the Secretary was not warranted. (*Id.*). Jeffrey Shane was briefed on the project by members of his staff and members of the FHWA staff, and after that briefing he "did not anticipate any further need for involvement by the Secretary with the project." (*Id.* ¶ 13). During the period between that meeting and the April 9, 1984 approval of the final supplemental EIS/4(f) Evaluation by FHWA, Shane met twice with opponents of the Blue Route and once with a proponent of the highway. (*Id.* ¶ 14). On the basis of the review of the documents by members of his staff, the briefing he received on the project and his meetings with concerned parties, Shane decided "that there was no need to request that the Secretary withdraw her delegation of approval authority for the Blue Route and personally make the decision on the project." (Id. ¶ 15).

▆ The delegation was valid under the regulations and orders adopted within the Department of Transportation and was not inconsistent with the policy of the Act. Oversight was properly conducted and there is no evidence that Ciletti was unduly influenced by superiors, failed to consider the relevant evidence or failed to exercise independent judgment. The decision is entitled to a presumption of regularity, and plaintiffs have offered no evidence to rebut that presumption.

---

**16.** The document as produced contains the handwritten notation, "yes", in the margin next to the description of the Blue Route. The author of this notation is identified in Federal Defendants' Answers to Plaintiffs' First Set of Interrogatories, Interrogatory # 27 at 29–31, as Matthew Scocozza. Scocozza, the Assistant Secretary for Policy and International Affairs, has not testified or submitted an affidavit. Any suggestion in the answers to interrogatories as to the significance of this notation is hearsay and will not be considered in ruling on this summary judgment motion.

**17.** Although Secretary Dole was to meet with Division Administrator Louis Papet on November 23, 1983, to discuss the Blue Route (*see* A.R. 165 at 2), that meeting apparently never took place.

The notation in the second memo to the Secretary that, "[a] clear indication that we continue to support the main features [sic] of the compromise is all that is needed now," does not indicate that the responsibility to exercise oversight was abdicated or that Ciletti was unduly influenced. That memo was drafted after the Office of the Secretary had reviewed and commented on the draft supplemental EIS/4(f) Evaluation, and so the Secretary's Office had already exercised a degree of supervision. Moreover, even after that memo to the Secretary, Shane continued to exercise oversight, including a thorough review by his office of the final supplemental EIS/4(f) Evaluation. There is no evidence that Ciletti was instructed, explicitly or implicitly, that he find one way or the other contrary to his independent judgment.

■ The Department of Transportation has filed an extensive administrative record documenting the participation of a number of individuals in the determination to approve the Blue Route. Despite the thoroughness of the Department's administrative record, I ordered some limited discovery to supplement and clarify that record, in part out of concern for the possibility for abuse in the extensive delegation and prior concurrence procedure used in this highly controversial major project. (*See* Memorandum and Order October 23, 1984). Judicial review would be greatly facilitated and the issues focused more clearly if projects such as this one, that are determined to be highly controversial according to the Department's own directive, were referred directly to the Office of the Secretary for independent review and formal findings of fact.[18] Such a procedure would avoid the potential for abuse and coercion inherent in the system of extensive subdelegation subject to prior concurrence. It would also avoid the need for discovery to ensure the absence of such abuse.

In the extensive and complete record there is no evidence of such abuse, and, in the absence of any supporting precedent, I decline to rule that this delegation was invalid under the Act.

### C. *Other Claims of Procedural Deficiency*

In addition to their claims with respect to the delegation of authority, plaintiffs also claim the section 4(f) determination is procedurally deficient because it fails to contain specific findings of fact and does not reflect independent, thorough analysis. Plaintiffs complain that the record of decision (ROD), rather than making specific findings, merely summarizes the conclusions reached in the final supplemental EIS/4(f) Evaluation. They also complain that Ciletti's consideration of the data in the final supplemental EIS/4(f) Evaluation and the briefings of his staff did not constitute an independent review required by section 4(f).

■ Section 4(f) does not require formal written findings by the decisionmaker. *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971). The FHWA regulations, however, do provide for documentation of section 4(f) decisions. In relevant part, the regulations provide:

> The Administration will document and make the Section 4(f) approval either in its approval of the FEIS [final EIS] or in the ROD for actions processed with EIS's. In those cases where the Section 4(f) approval is documented in the FEIS, the Administration will summarize the basis for its Section 4(f) approval in the ROD.

3 C.F.R. § 771.135(k); *see also* U.S. DOT Order 5610.1C ¶ 12, A.R. 305 at 149–50. The ROD constitutes the formal document approving the project. The ROD frequently refers to portions of the final supplemental EIS/4(f) Evaluation, referencing the basis for its conclusions. This documentation appears to be in compliance with the requirements of the regulations.

---

18. Such findings could, of course, incorporate by reference specific data contained in a more complete evaluation prepared by a regional office within the FHWA.

■ Ciletti relied on the information contained in the final supplemental EIS/4(f) Evaluation, and on briefing from members of his staff, in making the determination documented in the ROD. (*See* Notes of Testimony of Vincent Ciletti, September 19, 1984, Docket Entry # 33, at 9). The draft and final supplemental EIS/4(f) Evaluations were prepared under the supervision of the FHWA with oversight by the Office of the Secretary. The Administrative Record demonstrates clearly that the federal officials subjected the project to thorough independent scrutiny and did not merely rely on untested assertions of outside parties. The federal involvement throughout the approval process was pervasive, as demonstrated by the Administrative Record. (*See* A.R. 114, 121, 125, 131, 133–34, 138, 142, 145, 148–49, 154, 159, 162, 165, 167, 174, 180–82, 189, 201, 204, 206, 209, 219, 221–22, 231, 236, 240–42, 246–47, 250–52, 255, 258, 284, 294, 299). The record demonstrates that the federal officials did not merely rubber-stamp the proposals of state officials. In 1979, the federal officials refused to approve the project pending consideration of a scaled-down version. (A.R. 18). Again in 1983, when federal officials reviewed the supplemental environmental documents, they refused to concur that shifts 1 and 2 were not feasible and prudent. (A.R. 162). Ultimately, the project was scaled-down in 1980, and Shift 2 was incorporated into the Selected Alternative in 1984. The federal officials did not abdicate their duty to conduct a thorough, independent review.

D. *Substantive Review*

In addition to review of the procedure employed in approving the use of section 4(f) land, the court must conduct a thorough, probing, in-depth review of the substantive decision. The court must determine whether the Secretary or her delegate properly construed his or her authority under the Act, and whether, on the record before the decisionmaker, he or she could reasonably believe that "there are no feasible and prudent alternatives or that alternatives do involve unique problems."

*Overton Park*, 401 U.S. at 415–16, 91 S.Ct. at 823. The court must also determine whether the final decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 416, 91 S.Ct. at 824.

In the present case, the decisionmaker was Vincent Ciletti, Director of the FHWA Region III Office of Planning and Program Development. He testified that he made the decision based upon the information contained in the final supplemental EIS/4(f) Evaluation and upon briefing from members of his staff. (Notes of Testimony of Vincent Ciletti, Sept. 19, 1984, Docket Entry # 33, at 9). In reviewing Ciletti's decision, the main focus is upon whether he could reasonably have reached the conclusion he did upon the record before him. Post hoc rationalizations are, of course, irrelevant, and the court is limited to reviewing the decision made by the agency— the court may not substitute its judgment for that of the agency. In reviewing Ciletti's decision based on the record before him, I also consider the evidence presented in what the Department of Transportation has designated the "Administrative Record," and all other evidence before the court, in order to assess the propriety of the preparation of the record upon which Ciletti based his decision. The court must determine whether the decision was based on a consideration of the relevant factors.

■ Ciletti's findings demonstrate that he did correctly construe his authority under the Act. He specifically found that there was no feasible and prudent alternative to the use of the affected section 4(f) properties and that the proposal included all possible planning to minimize harm. (ROD, A.R. 303 at 13). The Department of Transportation argues, in support of the conclusions reached by Ciletti, that an alternative may be rejected as not feasible and prudent as long as it does not meet an established transportation need, or does not

accomplish the purposes of the project. Courts reviewing section 4(f) determinations have, indeed, affirmed determinations that rejected proposed alternatives that did not meet established transportation needs. *See Arizona Past & Future Foundation v. Lewis,* 722 F.2d 1423, 1428 (9th Cir.1983); *Adler v. Lewis,* 675 F.2d 1085, 1094 (9th Cir.1982); *Monroe County Conservation Council v. Adams,* 566 F.2d 419, 424 (2d Cir.1977); *Louisiana Environmental Society, Inc. v. Coleman,* 537 F.2d 79, 85 (5th Cir.1976); *Maryland Wildlife Federation v. Lewis,* 560 F.Supp. 466, 474 (D.Md.1983), *aff'd,* 747 F.2d 229 (4th Cir.1984); *Chautauqua County Environmental Defense Council v. Adams,* 452 F.Supp. 376, 383 (W.D.N.Y.1978); *Conservation Society of Southern Vermont v. Secretary of Transportation,* 443 F.Supp. 1320, 1325 (D.Vt. 1978). The duty of the Secretary or her delegate, however, is not to determine whether a proposed alternative meets established transportation needs or whether it accomplishes the purposes of the proposed project. *Stop H–3 Association v. Dole,* 740 F.2d 1442, 1455 n. 21 (9th Cir. 1984). Section 4(f) requires the decisionmaker to determine that no alternative is feasible and prudent. If a proposed alternative does not meet established transportation needs, the decisionmaker should reassess those needs, which should be fully documented, and then ultimately determine whether the alternative is feasible and prudent.

In the present case, Ciletti properly construed his authority as determining whether there was any feasible and prudent alternative. Ciletti determined that the No Build Alternative was not feasible and prudent. The Avoidance Corridor Analysis was an appropriate means for attempting to find an alternative that was feasible and prudent, and Ciletti determined that the Total Avoidance corridor was not feasible and prudent. He correctly construed his authority under the Act.

In making the section 4(f) determination, Ciletti considered several alternatives to the Selected Alternative. Ciletti rejected the No Build Alternative,[19] the Total Avoidance Alternative and several localized shifts that would have avoided specific protected property. Plaintiffs argue that the No Build Alternative is feasible and prudent. They do not claim that the Total Avoidance Alternative is feasible and prudent[20] but do contest several aspects of the Avoidance Corridor Analysis used to generate the Total Avoidance Alternative. They claim that Travel Band A, a 75 square-mile tract several miles to the west of the Selected Alternative, was improperly dismissed as a potential location for the highway. They also claim that the initial criteria for selecting 46 corridors that avoided section 4(f) land were improper, and that the eleven Candidate Corridors and ultimately the Total Avoidance Corridor were chosen on the basis of factors that should not have been considered. Finally, plaintiffs claim that the record fails to establish that the project includes all possible planning to minimize harm.

### 1. *The No Build Alternative*

Ciletti considered the No Build Alternative in two distinct aspects. He first considered whether doing nothing would be feasible and prudent and then considered whether improvements to local roads would present a feasible and prudent alternative to the Selected Alternative.

Ciletti rejected the Do Nothing Alternative because it would not relieve traffic congestion on local roads and would not provide for the regional transportation needs for a limited-access highway. Even under revised traffic projections, which were lower than previously projected, Ciletti found that "the existing facilities will soon become severely congested, particularly at intersections." (ROD, A.R. 303 at

---

**19.** No Build includes the "Do Nothing Alternative" and the "Improvements to Local Roads Alternative" which are essentially identical. *See supra* at 61–62.

**20.** All parties, including the intervenor defendants, agree that the Total Avoidance Alternative is not feasible and prudent.

8). The final supplemental EIS/4(f) Evaluation describes the current congestion:

> The corridor's primary north-south arteries are PA–329 and PA–252 which are two lane roadways for most of their length. During the peak traffic period each day 45% to 50% of the travel length of these arteries is congested with an additional 20% approaching unstable traffic flows. The capacity deficiency is so acute drivers often seek bypass routes on secondary and residential streets to avoid the main road congestion. Truck travel is particularly constrained for both local and regional needs.

(Final Supplemental EIS at V–5). These figures document severe congestion and traffic jams currently being experienced, not projected for the future. (*See* Traffic and Transportation Basis Report, June 1977, at II–4 to II–9, A.R. 35, Bulk Documents).

At peak travel hours the local roads are literally overflowing with traffic. Demand exceeds capacity on main roads and traffic spills over into residential streets. By the year 2000, 91% of the highway capacity in the corridor will be utilized as opposed to 66% if the highway is built. There is no reason to doubt the accuracy of these figures considering that volume is currently at or above capacity on significant stretches of the major local roads. (*See* Traffic and Transportation Basis Report, June 1977, at II–10 to II–12, A.R. 35, Bulk Documents). Building the highway is expected to result in a 20% decrease in traffic on the major local roads by the year 2000. (*See* Final Supplemental EIS at IV–19).

The DVRPC reviewed the traffic estimates based on 1977 data in light of more recent population figures available from the 1980 census and found that the differences were "negligible for all planning purposes and would not significantly affect the results of the traffic simulation of this expressway." DVRPC Report at 2.[21] Al-

though the Task Force, in its 1980 report, reached lower traffic estimates for the year 2000 on the Blue Route than originally forecast, these estimates were for traffic on a constructed highway in the Blue Route corridor, not for traffic on existing local roads. The main reason for these lower projections was the change in assumptions for the projected highway network to exclude two previously planned highways: the Lansdowne and Cobbs Creek Expressways. (*See* A.R. 40, I–476 Task Force Summary Report, Feb. 1980, at 4). The revised projections still show the Blue Route operating at close to capacity in the year 2000 and do not suggest in any way that the current congestion on local roads would be alleviated or reduced without the constructions of the Blue Route.

The DVRPC conducted a detailed review of year 2000 traffic estimates on certain segments of PA–320. (DVRPC Report at 5–6). The study showed that building the highway would increase traffic on one segment of PA–320. (*Id.* at 6). Overall traffic on PA–320, however, is still projected to decline substantially if the highway is built. (*Id.* at table 1; Final Supplemental EIS at IV–19).

 Upon such a record, it was reasonable to conclude that not building the highway would not be feasible and prudent. Not building a highway would certainly be feasible. An alternative is "feasible" if it can be accomplished as a matter of sound engineering. *Overton Park*, 401 U.S. at 411, 91 S.Ct. at 821. It is certainly feasible not to build any highway. A feasible alternative may be found imprudent, however, if it involves uniquely difficult problems or if the cost or community disruption resulting from such an alternative reaches extraordinary magnitudes. *Id.* at 413, 416, 91 S.Ct. at 822, 823. The severe congestion on the local roads in question, in conjunction with the stifling effect lack of adequate highway service will have on the

---

**21.** Although there was some comment received by the FHWA criticizing the DVRPC Report's methodology and findings, *see* A.R. 137, no party in this action has raised any dispute regarding the accuracy of the DVRPC finding of negligible differences between previous and current population projections.

local economy, provides sufficient grounds for Ciletti reasonably to conclude that not building the highway is not a prudent alternative.

In *Stop H-3 Association v. Dole,* 740 F.2d 1442 (9th Cir.1984), the Ninth Circuit held that the projections of future congestion and commuter delays involved in that case did not support the Secretary's finding that the No Build alternative was not feasible and prudent. In that case, however, current traffic statistics revealed that there was a substantial unused peak-hour capacity. *Id.* at 1455–57. In contrast, a substantial portion of the major roads along the path of the Blue Route are currently operating at capacity. There is no cushion to absorb future demand, and the situation is projected to worsen. Ciletti could reasonably have concluded that the congestion has reached an extraordinary magnitude and will continue to get worse.

Ciletti also rejected the alternative of improving local roads. He concluded that widening local roads and intersections would not alleviate congestion to the same degree that a limited-access highway would and that improving local roads would not serve the regional transportation needs of providing a beltway around Philadelphia and a limited-access link between I–95 and the Pennsylvania Turnpike. He also found that improvements to local roads would entail substantial community disruption and would affect historic sites protected by section 4(f). (Final Supplemental EIS at V–13 to V–14).

■■■ If there are two or more feasible and prudent alternatives that use a specific protected site, the Secretary must determine which feasible and prudent alternative minimizes harm to that site. *Louisiana Environmental Society, Inc. v. Coleman,* 537 F.2d 79, 85–87 (5th Cir.1976). Faced with an alternative that uses section 4(f) land different from the section 4(f) land used by the selected corridor, however, the Secretary cannot easily compare the harm done by the two alternatives under a minimization of harm analysis. Section 4(f) protects a number of distinct types of land,

and the comparison in harm to one type against harm to another type is not susceptible to objective certainty. "The quantitative weighing of harm to numerous and different types of valued resources is itself difficult, and the relative harm is not likely often to be capable of precise objective measurement." *Maryland Wildlife Federation v. Dole,* 747 F.2d 229 (4th Cir.1984).

■■■ Although the Secretary is required to minimize harm to section 4(f) lands, she is not required to choose a route with less adverse effects to section 4(f) lands that entails such extraordinary community disruption that it is not feasible and prudent. *Louisiana Environmental Society,* 537 F.2d at 86. In the present case, Ciletti was required to determine whether improvements to local roads was a feasible and prudent alternative to the Selected Alternative. In making that determination he was entitled, even required, to consider the degree that improvements to local roads would affect other section 4(f) sites. In addition to affects on other section 4(f) sites, Ciletti described severe community disruption that would result from improvements to local roads. He also found that improvements would not relieve congestion to the degree a limited-access highway would and would not serve the regional transportation needs. On this record, Ciletti could reasonably find that improving local roads was not a feasible and prudent alternative.

### 2. The Avoidance Corridor Analysis

The FHWA conducted an analysis to determine whether there was any feasible or prudent alternative location for the highway. This "Avoidance Corridor Analysis" set out to examine the area thoroughly and determine the impacts of highways along alternative routes. There are, of course, an infinite number of routes that could link I–95 with the Pennsylvania Turnpike, and so the FHWA had to use some means to establish specific corridors for analysis.

It first referred the matter to the Delaware Valley Regional Planning Commis-

sion (DVRPC) to determine the extent to which the current alignment could be shifted without losing its effectiveness and function. The DVRPC "considered two basic analyses." (DVRPC Report at 9). It conducted a comparative analysis of the daily miles of travel projected for highways built in three adjacent travel bands: A; B; and C. Each of these travel bands is approximately 75 square miles in size. They range in width from five to seven miles (east to west) and run (north to south) between the Pennsylvania Turnpike and I–95. Travel Band A is the farthest west; Travel Band B is in the middle; and Travel Band C is the farthest east. According to the DVRPC study, the respective projected daily miles of travel were: Travel Band A, 1,498,021; Travel Band B, 2,844,136; and Travel Band C, 3,573,336. (Final Section 4(f) Evaluation, app. at B–3).

The DVRPC also conducted an analysis using compiled data in a formula developed to estimate the location of a highway most suitable to serve the travel needs of a given area. This analysis yielded the result that a highway 7.7 miles west of the Schuylkill Expressway was optimal. They found that this distance coincided with the median location of the Selected Alternative.

The FHWA, noting on the basis of the DVRPC study that "an alignment located in Travel Band A would serve 60% less traffic than one located in Travel Band C; and 40% less than in Travel Band B," [22] determined that travel demand in Travel Band A "would not warrant a facility." (Final Section 4(f) Evaluation, at II–2). On this basis, Travel Band A was eliminated from consideration and travel bands B and C were designated the study area for the Avoidance Corridor Analysis.

■ Plaintiffs claim that Travel Band A was improperly eliminated from consideration. The FHWA had to define the study area by some reasonable means. It would be fruitless, and a waste of taxpayers'

money, for the FHWA to conduct extensive analysis of all the infinite possible links between the Pennsylvania Turnpike and I–95. Using the best available data, the Department determined that a highway in Travel Band A would draw 60% less traffic than would be drawn by a highway in Travel Band C. Considering the severe congestion of local roads in Travel Band C, the FHWA could reasonably conclude that it would be pointless to spend any more money studying locations for routes in Travel Band A. Section 4(f) requires the Secretary to find that there is no feasible and prudent alternative. Ciletti, the Secretary's delegate, did not specifically find that a highway through Travel Band A was not feasible and prudent, but that finding is implicit in the rejection of Travel Band A from study and Ciletti's finding that there was no feasible and prudent alternative. On the record, a decisionmaker could reasonably conclude that a highway in Travel Band A was not a feasible and prudent alternative, and the decision to eliminate Travel Band A did not render Ciletti's decision arbitrary and capricious.

After defining the study area as travel bands B and C, the FHWA set out to establish corridors within the study area that would avoid all section 4(f) land. The FHWA established 46 corridors that satisfied five requirements. The requirements were:

—to avoid all Section 4(f) lands
—to provide rational north-south travel without any excessively winding or twisting segments
—to minimize effects to residences in the area
—to reduce possible involvements with the major streams in the area
—to provide total east-west coverage of the study area to the extent possible.

(Final Section 4(f) Evaluation, at II–3).

The FHWA then identified and compared the adverse impacts of each of the corri-

22. The DVRPC figures actually seem to show that travel in band A (1,498,021) is approximately 49% lower than travel in band B (2,844,136). Any discrepancy is harmless error. If the FHWA eliminated Travel Band A from consideration on the 40% figure, it surely would also have eliminated Travel Band A based on 49% less travel than on Travel Band B.

dors. The 46 corridors identified were narrowed to eleven Candidate Corridors on the basis of a comparison of six impact factors thought "to critically represent the broad range of environmental and highway construction issues in the decision making process." (*Id.* at II–5). These six factors were:

—stream relocations

—residential relocations

—number of historic sites subject to potential impacts (but not 4(f) acquisitions)

—consistency with local land use plans

—disruption to local communities (neighborhood tracts affected)

—cost.

(*Id.*).

Any corridor that was one of the two least disruptive in any of those categories qualified as a candidate corridor. Eleven Candidate Corridors were analyzed in terms of thirteen categories of impacts:

—the number of stream crossings required

—the number of feet of stream relocation

—the number of acres of prime farmland

—the number of residences

—the number of apartment buildings

—the number of commercial or industrial buildings

—the total number of acres required

—the length of the link

—the number of historic sites within 50 feet

—the total cost

—the consistency with land use planning

—the disruption to local communities, and

—the direct effects on business patterns.

(*Id.* at II–4, II–8 to II–9).

On the basis of the impacts found with respect to the eleven Candidate Corridors, the Final Section 4(f) Evaluation noted that all eleven corridors entailed "community disruption of an extraordinary magnitude" and "unique and extraordinary" impacts rendering them not feasible and prudent alternatives. (*Id.* at II–7 to II–34). The

analysis, however, "did indicate that Candidate Corridor C–1 was clearly least disruptive being so in six of the thirteen evaluation criteria." (*Id.* at II–8). Corridor C–1 was therefore designated the "Total Avoidance Alternative" and carried forward for further analysis in comparison with the Selected Alternative. After an extensive comparison, the Total Avoidance Alternative was found not to be feasible and prudent.

On the basis of the Avoidance Corridor Analysis, Ciletti was essentially able to conclude that there was no alternative corridor in which the highway could feasibly and prudently be placed. The Final Section 4(f) Evaluation noted that the 46 corridors considered in the Avoidance Corridor Analysis included corridors approximating the Red/Yellow Route and the Green Route originally proposed as alternatives to the Blue Route in early planning stages decades ago. The FHWA essentially reassessed the placement of the highway, and, faced with quantifiable impacts it determined to be extraordinary, decided that there was no feasible and prudent alternative location for the highway.

 Plaintiffs do not claim that the Total Avoidance Alternative is feasible and prudent. None of the parties are in favor of building this alternative, and public comment included a strong showing of opposition to it. In light of the strong opposition voiced to this alternative and its severe adverse impacts, including cutting off a large population of elderly residents from a nearby shopping center, taking five acres of wetlands, splitting a cemetery in half, taking 67 homes in Nether Providence Township, and relocating 10,600 feet of streams, Ciletti could have reasonably found that it was not feasible and prudent.

Plaintiffs' concern, however, is not with the rejection of the Total Avoidance Alternative, but rather with the method used to narrow the field of alternatives considered. Plaintiffs complain that at least some of the factors considered were not permissible and that all of the criteria put together are

insufficient to support a finding of no feasible and prudent alternative. Plaintiffs further argue that, rather than assess the adverse impacts of the alternatives on their own, the FHWA should have developed figures for the normal impacts of building any highway and compared the impacts of each alternative to those for that norm.

Although *Overton Park* requires community disruption to be unique and of an extraordinary magnitude, there is no support in the statute or case law for plaintiffs' position that the FHWA must establish a normal disruption model before determining that any alternatives involve extraordinary disruption. Moreover, all of the factors considered by the FHWA in choosing and analyzing the avoidance corridors are rationally related to the ultimate determination whether a given alternative is feasible and prudent. If FHWA were to ignore a factor relating to community disruption in weeding out potential alternatives, it would end up with alternatives that needlessly caused more community disruption than potential alternatives rejected in the weeding-out process.

One troublesome issue is whether the FHWA may appropriately consider impacts that are related to the longstanding proposal for the highway along the Blue Route corridor. For example, the Blue Route is necessarily more consistent with current land use planning than any of the avoidance corridors, simply because land use planning has taken account of the twenty-year-old plans to build the highway in the Blue Route corridor. Certainly FHWA cannot merely push through approval of the Blue Route corridor on the bare grounds that people have gotten used to the idea that the highway will be there. On the other hand, it cannot be denied that the public, and local planning agencies, have long been aware of the proposed route of the highway and have, in fact, planned, built and developed around it. The effects on land use planning of moving the highway corridor at this point are very real effects that should not be ignored. Such a change would grossly disrupt established patterns. Considering the unique situation that this highway was approved—and construction commenced—before section 4(f) was adopted, the impacts that may be indirectly related to the longstanding expectation of a highway in the Blue Route corridor may appropriately be considered. Ignoring such impacts would be a disservice to the public. The record demonstrates that consideration of factors such as inconsistency with land use was in response to very real and immediately apparent impacts that the proposed alternatives would bring to bear on local communities.

Plaintiffs object that the 46 avoidance corridors were chosen subject to requirements such as providing "rational north-south travel without any excessively winding or twisted segments" and providing "total east-west coverage of the study area to the extent possible." (*See* Final Section 4(f) Evaluation at II–3). Finding corridors that served the basic transportation needs of the area, however, was a rational and reasonable step in attempting to identify a feasible and prudent alternative. Closer examination of how the 46 corridors were developed reveals that the FHWA was genuinely attempting to find the best possible alternatives. Links were developed between the major roads and shifted around to minimize impacts. (*Id.,* app. at B–5). The links were then pieced together to find the best possible complete corridors. (*Id.*)

Plaintiffs do not champion the cause of any particular avoidance corridor developed in the analysis. They do not propose any specific alternative that was not considered. They merely mount criticisms that constitute a "blanket condemnation of the whole project." *Cf. Township of Springfield v. Lewis,* 702 F.2d 426, 441 n. 27 (3d Cir.1983). As the Second Circuit stated in *Monroe County Conservation Council v. Adams,* 566 F.2d 419, 425 (2d Cir.1977):

Undoubtedly, innumerable additional variations of routes and designs could have been considered and analyzed. However,

the Department of Transportation was not "obligated to consider in detail each and every conceivable variation of the alternatives stated; it 'need only set forth those alternatives "sufficient[ly] to permit a reasoned choice." ' " (citations omitted).

Although protection of parklands must be given paramount importance, severe community disruption should not be ignored. *See Overton Park,* 401 U.S. at 412, 91 S.Ct. at 821. The factors considered were all relevant to the ultimate determination whether there was a feasible and prudent alternative. They were, therefore, properly considered in the avoidance corridor analysis. Finally, upon considering those factors, Ciletti could have reasonably concluded that there was no alternative placement for the highway that was feasible and prudent.

### 3. No Feasible and Prudent Alternative

Ciletti found that the No Build Alternative and the Total Avoidance Alternative were not feasible and prudent. The avoidance corridor analysis was a reasonable means of ascertaining whether there was any alternative location for the highway corridor.

Ciletti also considered four localized shifts that would avoid use of specific section 4(f) sites. He found that Shift 2 was feasible and prudent, and it was adopted as part of the Selected Alternative. Shift 1, which would have avoided the Robert Taylor House, an historic site, at first glance seems feasible and prudent. The Pennsylvania State Historic Preservation Officer, however, favored the Selected Alternative over Shift 1 because it involved less visual impact to the site. (A.R. 194). In light of the evidence that the Selected Alternative had less harmful impact on the historic

site, Ciletti could have reasonably concluded that Shift 1 was not feasible and prudent. Even if it were feasible and prudent, it is apparent that the Selected Alternative, and not an alternative incorporating Shift 1, would minimize harm to the historic site.

Ciletti considered three shifts that would avoid all or part of the Swarthmore College Woods.[23] Shifts 3, 3a and 3b were found not to be feasible and prudent because of the severity of their disruption of the community and the use of other section 4(f) sites required under shifts 3 and 3a. (*See* Final Section 4(f) Evaluation at VI–20 to VI–21). Finally, Ciletti considered Shift 4, which would avoid a 1.1 acre aerial easement in Black Rock Park. He found that Shift 4 was not feasible and prudent because it would require constructing a $4.6 million viaduct in the floodplain of Crum Creek that would have significant adverse environmental effects.

█ Plaintiffs do not specifically claim that any of the localized shifts that were rejected should not have been. They do generally attack Ciletti's determination that there was no feasible and prudent alternative. Reviewing the entire record, including analysis of the No Build Alternative, the avoidance corridor analysis and analysis of localized shifts, Ciletti could have reasonably concluded that there was no feasible and prudent alternative. He considered all the relevant factors and his ultimate conclusion is not arbitrary or capricious.

### 4. Minimization of Harm

Ciletti found that the proposal for the highway included all possible measures to minimize harm to section 4(f) sites. The adoption of the Task Force Alternative in 1980 was a substantial mitigation measure.

---

**23.** Before construction was enjoined in 1982 the Swarthmore College Woods were considered public parkland protected by section 4(f). Now the FHWA takes the position that the Swarthmore College Woods are not protected by section 4(f) because they are privately owned. (*See* A.R. 158, 175, 253). Despite this legal position, the FHWA has continued to treat the Swarthmore College Woods as section 4(f) land. Ciletti

essentially found that there was no feasible and prudent alternative to use of the Swarthmore College Woods and that the plans include all possible measures to minimize harm to the woods. The FHWA having satisfied the requirements of section 4(f) with respect to the Swarthmore College Woods, I express no opinion on whether those woods are properly construed as land protected by section 4(f).

The reduction from six to four lanes and narrowing of the median strip along certain stretches, as well as the downscoping of intersections, substantially reduced the harm to section 4(f) sites. The incorporation of Shift 2 into the Selected Alternative also reduced the harm to section 4(f) land. In addition to that mitigation, FHWA and PennDOT have included in plans for the highway specific mitigation measures designed to reduce particular impacts. Ciletti summarized those measures in the ROD:

1. Noise abatement measures and landscape planting will be used at the Robert Taylor House.

2. Landscaping, noise abatement measures, an access structure under the expressway, retaining walls to minimize land taking, and replacement of land acquired on a functional replacement basis will be used at the Lawrence Park site in close coordination with park officials.

3. Noise abatement measures, new and relocated access roads, pedestrian access from Smedley Park to other country-owned [sic] land, replacement of land acquired on a functional replacement basis, three bridges across the Crum Creek Oxbow to preserve the oxbow and the access along the creek and landscaping will be provided at Smedley Park as closely coordinated with park officials.

4. Appropriate landscaping, noise abatement measures and maintenance of adequate access will be included at Black Rock Park as coordinated with park officials.

(ROD at 12; *see also* Final Section 4(f) Evaluation at V–11, VI–23 to VI–24; Final Supplemental EIS at IV–56 to IV–62).

As a result of a compromise reached in 1981 with respect to a dispute between the Department of the Interior (DOI) and the Department of Transportation (DOT), the FHWA has committed itself to additional mitigation requirements. DOI has steadfastly opposed building the Blue Route, but dropped its formal opposition pursuant to a compromise reached on March 31, 1981. (A.R. 49). That compromise requires, inter alia, that the FHWA provide an environmental monitor and continue to consult with Swarthmore College on mitigation. Mitigation with respect to the Swarthmore College Woods will be developed in coordination with the Swarthmore College Task Force, which has been appointed to assure a continued effort to reduce impacts during the final design process. (Final Supplemental EIS at IV–59).

 Plaintiffs complain that the plans are not concrete and specific enough to satisfy the requirement that the project include all possible planning to minimize harm. Final design of the highway, however, cannot proceed until after the corridor for the highway has been approved pursuant to section 4(f). The FHWA commitment to mitigation sets out specific plans to mitigate particular impacts. The mechanics of those plans may appropriately be delayed until the final design after the section 4(f) determination. *See Maryland Wildlife Federation v. Dole*, 747 F.2d 229, 239–40 (4th Cir.1984); *National Wildlife Federation v. Lewis*, 519 F.Supp. 523, 536 (D.Conn.1981); *see also County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1378 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). *But cf. D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231, 1239 (D.C.Cir.1972).

The record demonstrates that Ciletti could have reasonably concluded that all possible planning has been included in the project to minimize harm to section 4(f) land. The commitments to design landscaping and noise barriers and to provide replacement land [24] are sufficient to support his finding. (*See* Mitigation Report, A.R. 81, Bulk Documents; Overview of Departmental Recommendations on the Blue Route (Interstate 476), PennDOT, April 1984, A.R. 276, Bulk Documents).

---

**24.** In Smedley Park 56.6 acres of wooded land have been supplied to replace the 6.6 acres taken.

## IV. *The National Environmental Policy Act*

The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4347, requires federal agencies to consider carefully the environmental impacts of their actions. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(C), requires that an environmental impact statement (EIS) be prepared to assess the adverse environmental impacts of proposed action and to discuss alternatives to that action.

■■■■■■ Although NEPA establishes "significant substantive goals for the Nation," the duties it imposes on agencies "are 'essentially procedural.'" *Strycker's Bay Neighborhood Council, Inc. v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (per curiam) (quoting *Vermont, Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)). The duty of a court reviewing agency action under NEPA is to ensure that the agency complied with NEPA's procedural requirements and that the agency made a "fully informed and well-considered decision." *Strycker's Bay,* 444 U.S. at 227, 100 S.Ct. at 500. The court should not substitute its judgment for that of the agency. *Id.*

The Third Circuit in *Concord Township v. United States,* 625 F.2d 1068, 1073 (3d Cir.1980), set forth the applicable standard of review:

> The review of an agency decision to go forward with a major federal action after the agency has prepared and considered an Environmental Impact Statement, requires the court to determine whether all necessary procedures were followed, to consider de novo all relevant questions of law, and to examine the facts to determine whether the decision was arbitrary, capricious, and an abuse of discretion.

(footnote omitted). *See also Township of Springfield v. Lewis,* 702 F.2d 426, 441 (3d Cir.1983).

■■■■ Plaintiffs' major contentions with respect to NEPA are that the EIS is deficient because: (1) it fails to discuss adequately the No Build Alternative and the alternative of a highway in Travel Band A; and (2) it fails to discuss adequately certain environmental impacts with respect to the Selected Alternative. In 1982, I enjoined construction of the highway pending completion of a supplemental environmental impact statement. The adoption of the Task Force Alternative was admittedly a major revision in the project and the FHWA, in adopting that major revision, had not followed the procedure for study and public comment mandated by NEPA and the regulations promulgated pursuant to NEPA. Since I ordered construction enjoined in 1982, the FHWA and PennDOT have prepared a draft supplemental EIS/4(f) Evaluation that was circulated to the public. (A.R. 145, Bulk Documents). Public hearings were held on the project on September 14 and 15, 1983 in which the public was given an opportunity to comment on the draft supplemental EIS/4(f) Evaluation. (Final Supplemental EIS, vol. 2, at IX–3 to IX–6). Extensive public comments were received and the FHWA and PennDOT responded to those comments. (Final Supplemental EIS, vol. 2). The FHWA clearly followed the procedure required by NEPA. The only question is the adequacy of the EIS.

The first issue with respect to the adequacy of the EIS is whether it sufficiently discusses the alternatives to building the highway in the Blue Route corridor. Plaintiffs claim that there should be a more complete discussion of the No Build Alternative and of the possibility of a highway in Travel Band A.

■■■■ The requirement that an EIS discuss the alternatives to a proposed action does not mean that the document must fully discuss every conceivable alternative and its environmental consequences. The EIS need not "consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative." *Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973), *cert. denied,* 416 U.S. 961,

94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). "Rather, the EIS need only set forth those alternatives 'sufficient to permit a reasoned choice.'" *Id.* (quoting *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 833 (D.C.Cir.1972)).

■ The final supplemental EIS specifically discussed the No Build Alternative in both the aspect of doing nothing and the aspect of improving local roads. (Final Supplemental EIS at II–3, V–5, V–13 to V–14). The discussions adequately set forth the alternative of not building the highway and provide a sufficient basis for concluding that that is not a viable alternative.[25] The FHWA was not required to conduct a detailed environmental analysis of this alternative, which it reasonably found not to be viable.

■ The possibility of a highway in Travel Band A was not thoroughly discussed as an alternative. The final supplemental EIS does set forth the reasons for eliminating Travel Band A from consideration, and it describes the avoidance corridor analysis performed in an attempt to find a viable alternative to building in the Blue Route corridor. (*Id.* at V–1 to V–4). The decision to eliminate Travel Band A from consideration because a highway there would serve 60% less traffic than a highway in Travel Band C was reasonable. The data set out in the final supplemental EIS/4(f) Evaluation was sufficient to allow a reasoned choice.

■ Plaintiffs complain that the DVRPC study, upon which the rejection of Travel Band A was based, was not set out in the documents released to the public for comment. The results of the study, however, were published in the draft supplemental EIS/4(f) Evaluation (A.R. 145, 4(f) Evaluation at 25–27) and in the appendix to the final section 4(f) evaluation (Final Section 4(f) Evaluation, app. at B–3). The DVRPC Report was referred to as the basis for the decision to reject Travel Band A,

and there is no evidence that the public was denied access to that report. Plaintiffs ultimately obtained a copy of that report in the course of this litigation but have failed to offer any evidence impeaching its accuracy or validity.

■ The law does not require that all technical data relied upon be published in an EIS, as long as what was considered is sufficiently referenced in the EIS. *See Life of the Land v. Brinegar,* 485 F.2d 460, 468 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). The FHWA complied with the requirements of the law.

Finally, plaintiffs complain that the final supplemental EIS inadequately discusses certain of the environmental impacts of the Selected Alternative. Specifically, plaintiffs claim that there was inadequate consideration of noise impacts, the impact on incidence of traffic accidents, the impact on the chemical quality of stream water and the impact on groundwater hydrology.

The noise impacts were discussed in the draft supplementary EIS (SEIS at 10, 62, 99–100 & 121) and the findings were summarized in the final supplemental EIS (Final Supplemental EIS at IV–16 to IV–17, IV–38 & IV–61). The final section 4(f) evaluation makes specific commitments to noise abatement measures. (Final Section 4(f) Evaluation at V–11, VI–23 to VI–24, VII–8, VII–12 & VII–16).

■ The 1980 Final EIS contains a discussion of projected traffic accident statistics. A similar discussion was not included in the final supplemental EIS because "[t]here was no change in traffic accident data from the previous Final EIS/4(f)." (Federal Defendants' Brief at 119). The draft and final supplemental EIS's both contain thorough discussions of traffic and transportation impacts. Those discussions are sufficient to satisfy the demands of NEPA. Neither NEPA nor my opinion in *Marple Township v. Lewis* requires specif-

---

**25.** See the discussion of this alternative with respect to the section 4(f) review, *supra* at 74–76.

ic types of data on particular subjects. They also do not require revisions of any data if there is no reason to assume that new studies would reveal any changes. Plaintiffs offer no evidence that would suggest any substantial change in traffic accident projections. The data on traffic and transportation impacts satisfies the requirements of NEPA.

The draft supplemental EIS (SEIS at 43–46) and the final supplemental EIS (Final Supplemental EIS at II–11, VI–1 & IX–436) discuss new findings with respect to the chemical conditions of streams in the Blue Route corridor. Although the new data is not all good news, it is fully set forth in the documents. Finally, ground water hydrology is discussed in both the draft supplemental EIS (SEIS at 89) and the final supplemental EIS (Final Supplemental EIS at IV–11).

■ A review of the draft and final supplemental EIS's reveals that the agency did take a "hard look" at the environmental consequences. Cf. Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). The agency's decision to approve the project based on the final supplemental EIS was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.

### V. Wetlands Finding

Plaintiffs claim that Secretary Dole failed to comply with Executive Order 11,990, 3 C.F.R. 1977 Compilation 121 (1978), 42 Fed.Reg. 26,961 (1977), which provides for the protection of wetlands.[26] Executive Order 11,990 was promulgated by the President in 1977 to effectuate the policy of NEPA. Plaintiffs claim that the Secretary has violated section 2 of the order which provides that each federal agency

shall avoid undertaking or providing assistance for new construction located in wetlands unless the head of the agency finds (1) that there is no practicable alternative to such construction, and (2) that the proposed action includes all practicable measures to minimize harm to wetlands which may result from such use. In making this finding the head of the agency may take into account economic, environmental and other pertinent factors.

■ Executive Order 11,990 imposes duties on federal agencies above and beyond the general requirements of NEPA. The executive order requires a finding as to wetlands analogous to that required by section 4(f) before parklands may be used in a federal project. The language of Executive Order 11,990, however, is less restrictive than that of section 4(f). Section 4(f) mandates that the Secretary "shall not approve" a project unless "there is no feasible and prudent alternative" and requires "all possible planning" to minimize harm to parkland. Executive Order 11,990, on the other hand, provides that an agency head "shall avoid undertaking or providing assistance for new construction located in wetlands" unless he or she finds that "there is no practicable alternative" and that "the proposed action includes all practicable measures to minimize harm to wetlands." The executive order also expressly permits consideration of "economic, environmental and other pertinent factors." The language of the executive order, although evidencing a strong commitment to the protection of wetlands, does not contemplate a range of choice for the agency as narrowly constricted as that demanded by section 4(f). National Wildlife Federation v. Adams, 629 F.2d 587, 591 (9th Cir. 1980). The directive to consider "economic, environmental and other pertinent factors"

---

**26.** Wetlands are defined as:

those areas that are inundated by surface or ground water with a frequency sufficient to support and under normal circumstances does or would support a prevalence of vegetative or aquatic life that requires saturated or seasonally saturated soil conditions for growth and reproduction. Wetlands general-

ly include swamps, marshes, bogs, and similar areas such as sloughs, potholes, wet meadows, river overflows, mud flats, and natural ponds. Executive Order 11,990 § 7(c), 3 C.F.R. 1977 Compilation at 123; see also U.S. Dept. of Transp. Order 5660.1A ¶ 4(a), 43 Fed.Reg. 45,-285, 45,286 (Sept. 29, 1978).

appears to be calculated to give the agency greater discretion than allowed under section 4(f) determinations pursuant to the standard established in *Overton Park*.

The Department of Transportation has published an order implementing Executive Order 11,990. U.S. Dept. of Transp. Order 5660.1A, 43 Fed.Reg. 45,285 (Sept. 29, 1978). The Department contends, however, that Executive Order 11,990 does not require a wetlands finding for the Blue Route because the order expressly provides that it does not apply to projects "for which a draft or final environmental impact statement [is] filed prior to October 1, 1977." Executive Order 11,990 § 8, 3 C.F.R. 1977 Compilation at 123; *see also* U.S. Dept. of Transp. Order 5660.1A ¶ 8(b), 43 Fed.Reg. at 45,287.

A draft EIS was prepared and filed for the Blue Route in 1976, prior to October 1, 1977. After my order enjoining construction in 1982, however, the FHWA prepared a draft and final supplemental EIS. These documents were prepared after the effective date of Executive Order 11,990. Neither the executive order nor the Department of Transportation order implementing it speaks to the effect of a supplemental EIS on the applicability of the executive order.

■ The Department of Transportation order, however, provides that "[a]ll programs and projects proposed for direct construction, assistance, or permit by the DOT shall be reviewed for consistency with the policy of this order." U.S. Dept. of Transp. Order 5660.1A ¶ 8(a), 43 Fed.Reg. at 45,287. Where there is some doubt as to the applicability of a law, regulation or order that is intended to protect the environment, such doubt generally should be resolved in favor of its application to guard against permanent damage to the environment. Executive Order 11,990 represents the longstanding and continuing policy of the federal

government. There is no demonstration that applying it to this project would present any hardship to the FHWA, particularly in light of the directive in the 1978 Department of Transportation Order to review pending projects for consistency with the Order. Moreover, this Court's order requiring the preparation of a supplemental EIS before going ahead with the project required that environmental consequences be studied further. The supplemental EIS was prepared well after the effective date of the Executive Order.

■ Indeed, FHWA recognized that the policy of protecting wetlands must be applied to this project. Although FHWA continues to take the legal position that a wetlands finding was not required for this project, it did discuss the impacts to wetlands in the draft supplemental EIS and made a formal wetlands finding in the final supplemental EIS. (Draft SEIS at 91; Final Supplemental EIS at II–12 to II–13, IV–57 to IV–58). The FHWA received comments on the impacts to wetlands and responded by making a formal finding in the final supplemental EIS that committed to mitigation measures, including provision of replacement wetlands. (Final Supplemental EIS at IX–435).

Authority to make the wetlands finding was validly delegated to Ciletti.[27] Ciletti's decision was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. The highway project would require construction in four wetlands, each less than an acre in size. One other wetland area larger than any of those four would have been taken under the highway as originally proposed but was avoided by adoption of the Task Force Alternative. A more thorough discussion of the economic, environmental and other pertinent factors might have allowed more effective judicial review, but the record is more than adequate to establish that the decisionmaker could reasonably believe

**27.** Unlike section 4(f), which imposes duties on the Secretary of Transportation, Executive Order 11,990 applies to all agencies and requires a finding by the "head of the agency." The language of the order does not imply that the duty to make findings is nondelegable. It refers to the head of the agency because it applies to several different agencies, not because of an intent to make decisionmaking authority nondelegable.

that there was no practicable alternative and that all practicable measures to minimize harm to the wetlands were included.[28] Particularly in light of the commitment to provide replacement wetlands, Ciletti's decision was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

## VI. *Conclusion*

The FHWA has filed an extensive administrative record documenting the approval of this highway. The record demonstrates that the agency took a good, hard look at all the environmental consequences of building the highway. NEPA demands that the agency thoroughly examine the environmental consequences and set out information sufficient to reach a well-reasoned decision whether to proceed with the project.

Draft and final EIS's were prepared for this project and, in 1979, the FHWA demanded that further study be conducted to determine whether a smaller highway with less adverse impacts to the environment could serve the transportation needs of the area. The Task Force, composed of FHWA and PennDOT officials, came up with a proposal for a smaller highway, which was adopted. Pursuant to my 1982 order, FHWA and PennDOT prepared draft and final supplemental EIS's to document and allow comment upon the environmental consequences of the project in its updated, scaled-down version. The FHWA complied with the procedures mandated by NEPA and the documents provide a sufficient basis to reach a well-reasoned decision on whether to build the highway. The FHWA concluded that the highway should be built, and that decision was not arbitrary or capricious.

Section 4(f) of the Department of Transportation Act places narrow restrictions on the authority of the Department to use parklands and historic sites for the construction of highways. The Department cannot use section 4(f) lands unless truly extraordinary circumstances leave it no other alternative. Even where there is no other alternative, the Department must ensure that all possible measures will be taken to minimize the harm to section 4(f) land.

In my prior opinion enjoining construction of this highway, I stated that merely reciting the categories of adverse impacts associated with building any highway would not provide a sufficient basis for the Secretary of Transportation to conclude that there was no feasible and prudent alternative. The current section 4(f) determination, in contrast to the previous one, is not based on conclusory statements that any alternatives involve hopelessly severe impacts. It details and specifies the reasons for the determination that there is no feasible and prudent alternative.

The FHWA has documented the need for the highway, providing data showing severe current congestion on existing major local roads. It has conducted an exhaustive, objective search for an alternative corridor that would meet the transportation needs of the area without using section 4(f) land. This avoidance corridor analysis documents, in objective terms, the adverse impacts associated with any alternative to taking section 4(f) land. There is no evidence that any of the data considered by the section 4(f) decisionmaker was inaccurate. That data provides an adequate basis for the decisionmaker reasonably to conclude that there was no feasible and prudent alternative to building the highway in the Blue Route corridor.

Both the FHWA and PennDOT have made commitments to extensive mitigation measures to minimize the harm to section 4(f) lands. These plans appear to be as detailed as they can be at this stage of the design of the highway. An environmental

---

**28.** There may be serious doubt as to whether Executive Order 11,990 and U.S. Dept. of Transp. Order 5660.1A concerning wetlands permit enforcement through a private cause of action. *Sierra Club v. Hassell,* 636 F.2d 1095, 1100 (5th Cir.1980). Because, however, there was compliance with these orders, the issue whether there is a private cause of action need not be decided.

monitor and consultation with the Swarthmore College Task Force, as well as the specificity of the commitments in the documents, should ensure that harm will, in fact, be minimized.

This highway has been planned for decades, and those plans have been shown to be a response to a well-demonstrated need. Although the highway was originally planned in an era when planners were less careful about environmental consequences than the planners of today, the FHWA has subjected those original plans to the rigorous scrutiny required of today's projects. As a result of this scrutiny, the highway has been scaled-down, and the plans have incorporated extensive measures to reduce the environmental impacts of the highway construction.

The very existence of this lawsuit demonstrates that not everyone would agree with the decision to build this highway. After over ten years of study and thousands of pages of documentation, however, no one could convincingly claim that the FHWA did not take a good, hard look at the environmental consequences of the project and the possible alternatives.

The Secretary has a very narrow authority to use section 4(f) lands under truly extraordinary circumstances. The FHWA has adequately documented the basis for its reasonable conclusion that this project presented such extraordinary circumstances. This conclusion was not arbitrary, capricious or an abuse of discretion.

■ Plaintiffs have suggested that all of the time, energy and study that went into preparing the supplemental draft and supplemental final EIS was an exercise in "rubber-stamping" approval of what had previously been decided upon in the original Task Force Addendum, and that the supplemental EIS procedures were a process to rationalize and justify the original decision. This argument presupposes that the earlier plan was substantially flawed. Nothing in my earlier opinion was intended to suggest that the Blue Route as then planned did not comply with all substantive federal environmental laws, or that the

route would either have to be substantially relocated or not built at all. The mere fact that the extensive additional studies and airing of public opinion did not cause the decisionmakers to alter the plans, except as to Shift 2, does not mean that both the earlier and present plans were wrongly approved. Having critically reviewed the massive record in this case to be sure that the supplemental EIS is not merely a "post hoc" rationalization, I have reached the firm conclusion that the "Secretary could have reasonably believed in this case that there are no feasible alternatives or that alternatives do involve unique problems"; that the Secretary acted within the scope of her statutory authority; and that the actual choice made was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. In addition, all of the substantive and procedural requirements of NEPA, section 4(f) and Executive Order 11,990 have been met.

Having considered the entire administrative record, summary judgment will be entered in favor of the defendants on all counts and issues.